(149 App. Div. 373.)

### COWELL v. SAPERSTON et al.

(Supreme Court, Appellate Division, Fourth Department. March 6, 1912.)

1. MUNICIPAL CORPORATIONS (§ 706*)—COLLISIONS BETWEEN PEDESTRIANS AND AUTOMOBILES—JURY QUESTIONS—NEGLIGENCE AND CONTRIBUTORY NEGLIGENCE.

   In an action for death of a pedestrian struck by an automobile, whether the driver was negligent, and whether decedent was guilty of contributory negligence, *held* under the evidence jury questions.

   [Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1518; Dec. Dig. § 706.*]

2. MASTER AND SERVANT (§ 330*) — EXISTENCE OF RELATION — EVIDENCE — WEIGHT.

   In an action for death of a pedestrian struck by defendant's automobile, evidence *held* to warrant a finding that the chauffeur was acting as defendant's employé and not for another at the time of the accident.

   [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1270–1272; Dec. Dig. § 330.*]

   McLennan, P. J., and Foote, J., dissenting.

Appeal from Trial Term, Erie County.

Action by Margaret Cowell, Edward Cowell's administratrix, against Elizabeth Saperston and another. From a judgment for plaintiff and from an order refusing a new trial, defendant Saperston appeals. Affirmed.

Argued before McLENNAN, P. J., and SPRING, KRUSE, ROBSON, and FOOTE, JJ.

Clinton B. Gibbs, for appellant.
Joseph A. Wechter, for respondent.

SPRING, J. About 7 o'clock on the evening of October 20, 1910, Edward Cowell, the plaintiff's intestate, while crossing Elk street, in the city of Buffalo, was struck by an automobile owned by the appellant and received injuries from which he died within 24 hours. The plaintiff brought her action against the defendant and one John J. Brown, who was in the automobile at the time the collision occurred, and the jury rendered a verdict against the appellant only.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Elk street extends in an easterly and westerly direction and crosses Louisiana street at right angles. There are two street car tracks in Elk street, the northerly of which is for cars going westerly, and the northerly rail of this track is $13^8/_{10}$ feet from the northerly street curb. Cowell and Dailey, a fellow workman, on the evening of the accident were going from their place of work homeward on an Elk street car going east. The car stopped from 125 to 150 feet west from Louisiana street, and the plaintiff's intestate and his companion, with other passengers, alighted. Cowell and Dailey went around the rear of the car and started, not on a crosswalk, diagonally to a barber shop on the opposite side of the street. Cowell was ahead, and when he was between the rails of the northerly track he was hit by the automobile of the appellant, which was going westerly at 20 miles an hour. No horn was sounded on the automobile or other signal given of its approach, as the evidence undisputedly shows. The automobile, as it was going westerly, was close to the curb. There was another automobile close to the curb in front of the barber shop, and, as it is claimed for the purpose of avoiding this machine, the automobile of the defendant when within about 40 feet of Cowell, suddenly veered to the south upon the northerly car track, and so struck Cowell. There was ample space between the automobile standing in front of the barber shop and the northerly rail of the car track for the automobile to pass in safety. When the automobile which struck Cowell was within a few feet of him, a man named Carberry gave a warning of the danger; but Cowell either did not hear it, or did not have time in which to avoid the danger.

[1] The questions of the negligence of the driver of the automobile and the freedom from contributory negligence of plaintiff's intestate were for the jury to determine, and there is not much claim that it went astray on either of these questions.

[2] The interesting question is whether the negligence of Etjen, the chauffeur, is imputable to the appellant, Mrs. Saperston. The automobile was owned by her. It was an expensive Thomas seven-passenger car. Etjen was her regular chauffeur. She was a widow, and the defendant Brown had been a friend of her husband, who died about two years prior to the accident. Brown was a candidate for State Senator and had used the automobile once before in conducting his campaign. He talked with Mrs. Saperston over the telephone, and gives this version of the conversation:

"I called her up and told her I had some campaign literature that I wished to distribute in South Buffalo that afternoon—I believe it was the day before I called her up—and asked her if her chauffeur might take me out riding through this territory. She said she would be very glad to send him down."

Etjen, the chauffeur, testified:

"Mrs. Saperston says: 'George, drive down to Mr. Brown's office. He wishes to go out campaigning; and take him wherever he wishes to go, in the afternoon. Mr. Brown is running to be State Senator, and I am lending the car to help him out.' Mrs. Saperston said I might get back before dark, if I possibly could; she didn't want to leave the car out very late. She didn't fix any exact time except to say to 'get back before dark, if you could.'"

Mrs. Saperston's narration of the communication with Brown is as follows:

"Mr. Brown called me up on the 'phone and asked me if I would allow him to use the machine, the next day, I believe. I said I was not expecting to use it, and I would be very glad to send it down to him. I asked him what time, and he said about 3 o'clock. I ordered the chauffeur down to the Ellicott Square to Mr. Brown's office to take Mr. Brown out and use the car for a few hours. I believe that was the second time Mr. Brown had used the car. Q. Did he tell you what he wanted to use it for? A. There was no conversation as to the use of the car, but I understood Mr. Brown was running for office, and it was to be used for his own purposes; that is all."

She further said:

"This automobile was to be driven by Mr. Etjen wherever Mr. Brown desired to go. No limitation as to the place or time. I paid Mr. Etjen by the month. I did not take any time out for the time he spent with Mr. Brown. I had employed Mr. Etjen to operate my car. That is the very purpose for which he was employed, and that was the purpose for which he went to Mr. Brown's office. That is why I sent him there to operate that car. The first time Mr. Brown asked me for the car he told me he was making a campaign for office."

She also testified the car was for her private use. "Never was hired or rented out. There was nothing said about rental on that day." Etjen met Brown at Ellicott Square, saying to him:

"I have been sent down by Mrs. Saperston to take you out this afternoon. Where do you want to go? I understand it is to distribute this campaign literature, is it here? I said, 'No.' He said, 'Where is it?' I said, 'At the printer's.' He told me he had orders to be back at half past 7."

The defendant Brown placed the campaign literature in the car, and three companions went along to aid him in its distribution. Brown told the chauffeur the points of destination in order to dispose of his campaign material. He gave no instructions as to the operation of the car, the rate of speed, or the routes or streets to be taken. Etjen operated and manipulated the car without interference or suggestion from Brown or his companions and was not under the control of Brown, except that, in pursuance to the directions of his employer, Mrs. Saperston, he stopped in the trip at the places requested by Brown, and that was the sum total of the suggestions made by the latter. As Etjen testified:

"In the manner of operating that car that afternoon nothing was said by Mr. Brown about the speed; I was to use my own judgment. He did not indicate to me where to put on the brakes. I know when, myself."

The reason for Mrs. Saperston sending out her car was to enable Brown to disseminate literature, which, we may assume, exploited his especial and superior efficiency for the office of State Senator. She did not, however, surrender either control of her car or of her chauffeur to the aspirant for political favor. She did not permit Brown to operate the car himself, nor did she relinquish to him the dominion of her employé. He was hedged about with specific instructions which permitted him to go where Brown desired. As Etjen said:

"The car was entirely in my charge in the matter of operation. I went down to Mr. Brown's office for the purpose of taking him out. That was my instruction from Mrs. Saperston."

The question of fact, and there was very little variation in the testimony bearing upon the control and authority of the chauffeur, was submitted to the jury in a careful and elaborate charge, and is summarized in this succinct statement:

"Therefore, it becomes a question of fact for you to determine, under all the evidence in this case, whether the chauffeur, under the instructions already given, was, for the time being and at the time of the accident, the agent or employé of Brown or of Mrs. Saperston."

The appellant's counsel cites a number of cases illustrative of the well-settled rule of law that before one can recover against a master for injuries sustained through the wrongdoing of his alleged servant, by virtue of the doctrine of respondeat superior, inevitably the relation of master and servant must be proven to exist. The crux in all these cases having any relation to the present case, so far as I have been able to find, is that the actual control and dominion over the servant was surrendered by the regular employer and taken over by the person in whose business he was engaged for the time being.

I will refer to a few of these authorities. In Wyllie et al. v. Palmer et al., 137 N. Y. 248, 33 N. E. 381, 19 L. R. A. 285, a leading case, the defendants, Palmer's Sons, who were manufacturers of fireworks, sold to a committee in the city of Auburn a quantity of fireworks and sent a man and a boy to assist in making the display. The relations of the parties were fixed by two letters set out in the opinion. The committee made all the arrangements for the exhibition, "and the man and boy sent by the defendants acted under their directions." The boy was directed by a member of the committee to discharge rockets, and one of them went off in a horizontal direction and injured the plaintiff, who was a bystander. The court held that the contract between the parties was for the sale and delivery of goods, and that the boy immediately responsible for the injuries suffered by the plaintiff was under the control and dominion of the committees who were discharging the fireworks, and not under the authority of the sellers of the goods; and there lies the distinction between that case and the present one, for the jury have found upon evidence justifying the conclusion that the appellant did not part with her dominion over her chauffeur.

In Higgins v. Western Union Telegraph Co., 156 N. Y. 75, 50 N. E. 500, 66 Am. St. Rep. 537, a building owned by the defendant had been damaged by fire, and a contractor was engaged in repairing and restoring it, and, among other things, was to furnish elevators, and they were then in his use and control. He needed a man to assist him in the operation of one of these elevators and obtained from the defendant a man named Alger, who took charge of the elevator, and whose negligence was responsible for the accident. There it appears that the contractor had control of the elevator. It was his property, and he also gave directions and orders to Alger, which constitute the very essence of the distinction I am seeking to make.

In Friebaum v. Brady, 143 App. Div. 220, 128 N. Y. Supp. 121, there are some expressions in the opinion which uphold the position taken by the counsel for the appellant, but they are not necessary to

the decision, for the facts recited in the opinion very clearly show that the defendant was not liable. There were two brothers, each owning an automobile, which were kept by them with a garage company. The defendant lived in Long Island, and the other brother at the St. Regis Hotel. Some one representing the brother at the St. Regis Hotel called up the garage company, asking for a chauffeur, who was procured and went with the automobile of the defendant to the hotel where the brother was residing. Mrs. Brady, who was the wife of the one stopping at the hotel, took the car, and while using it an accident occurred, and the plaintiff sued James Brady, the one residing in Long Island; and the court held he was not liable. To hold otherwise, it seems to me, would be ridiculous. While it was his car and there was an arrangement between the two brothers by which if one machine was out of commission the other could be used by either of them, yet he did not even order out the car, knew nothing about it, but it was ordered and engaged in the business of the wife of the brother and with the chauffeur engaged by him; so that case is not applicable.

In Clark v. Buckmobile Co., 107 App. Div. 120, 94 N. Y. Supp. 771, decided by this court, a man named Birdsall, who was the general manager of the defendant, went to Syracuse on his own business, taking an automobile of the defendant, and the chauffeur was under the direction of Birdsall and engaged in his business, and this court held that the owner of the automobile was not liable for injuries sustained by the plaintiff while the car was under the control of Birdsall.

There are two other cases in this court which are cited by the appellant's counsel (Casey v. Davis & Furber Machine Co., 138 App. Div. 397, 122 N. Y. Supp. 804; and Wolf v. Mosler Safe Co., 139 App. Div. 848, 124 N. Y. Supp. 541); but in each of those cases the evidence showed clearly that the man was furnished by the defendant to do some particular work and while doing it was absolutely under the control and authority of the temporary employer. It perhaps is not very useful to cite authorities on this proposition, because in nearly every instance the evidence discloses that there was a surrender of dominion and authority by the regular employer of the servant, and an absolute assumption and assertion of authority by the person or corporation in whose business he was engaged for the time being. There is no doubt, when that condition exists, that the regular employer is not liable.

The recent case of Kellogg v. Church Charity Foundation, 203 N. Y. 191, 96 N. E. 406 (Advance Sheets of November 18, 1911), is somewhat in point. In that case the defendant maintained St. John's Hospital in Brooklyn, and it owned an ambulance which collided with the plaintiff, who was riding a bicycle, and injured him, and he sought to hold the defendant liable for the injuries he sustained. It seems the ambulance was kept at a livery stable. Whenever the defendant desired to use it, it notified the livery stable keeper, who for hire furnished a horse and driver for the ambulance, and that was done on this occasion, and it was the negligence of this driver which caused the injuries to the plaintiff. The driver was hired and paid by the

livery stable keeper, but when he was driving the ambulance he was under the authority and control of the defendant, and yet the Court of Appeals held that the defendant was not liable; that the relation of master and servant did not exist between it and the driver of the ambulance. At the close of the opinion, at page 200 of 203 N. Y., at page 409 of 96 N. E., the court, as its summary of the law applicable to the situation, says (quoting in part from Standard Oil Co. v. Anderson, 212 U. S. at page 222, 29 Sup. Ct. at page 254 [53 L. Ed. 480]):

"Where one furnishes another with men to do work for him and places them under his exclusive control in its performance, those men become pro hac vice the servants of him to whom they are furnished, and he is responsible for their negligence because the work is his work and they are his workmen for the time being. On the other hand, where work is undertaken to be performed by the person who furnishes the workmen through servants of his selection, and he retains direction and control, he remains responsible for any negligence on their part in the conduct of the work. 'The simplest case, and that which was earliest decided, was where horses and a driver were furnished by a liveryman. In such cases the hirer, though he suggests the course of the journey and in a certain sense directs it, still does not become the master of the driver and responsible for his negligence, unless he specifically directs or brings about the negligent act.' "

I think the question of fact was properly determined by the jury, and that the verdict should be sustained.

Judgment and order affirmed, with costs. All concur, except Mc-LENNAN, P. J., and FOOTE, J., who dissent in separate memorandums.

McLENNAN, P. J. (dissenting). The undisputed evidence is to the effect that the defendant Saperston loaned her car and chauffeur to the defendant Brown to enable him to prosecute his individual business. The prosecution of such business was to commence at about 3 o'clock in the afternoon and was to continue during the afternoon and until dark. The defendant Brown accepted the car and chauffeur of Mrs. Saperston for the purpose of enabling him, as a candidate for State Senator, to promote his candidacy for such office. The defendant Mrs. Saperston's car was finally delivered to him with her chauffeur, intended to be used for the purposes of Mr. Brown, the candidate. In such delivery the instruction given to the chauffeur by the defendant Saperston was that he (the chauffeur) would take the defendant Brown on any tour which Brown might direct. Because of the direction of the defendant Brown the chauffeur went upon the street in question, and because of the chauffeur's negligent management of the car, as alleged, Mrs. Saperston is held to be liable.

My notion is that the negligence of the chauffeur was the negligence of the defendant Brown; that he (Brown), having been intrusted with the duty of indicating the route such car should take, was responsible for the method of traversing such route.

I therefore vote for reversal of the judgment and order.

FOOTE, J. I dissent. I think the testimony of the three parties concerned quoted in full in Judge Wheeler's charge to the jury

shows that the transaction was a loaning by Mrs. Saperston of her car and chauffeur to Mr. Brown for use in Mr. Brown's business, and that while the car was so being used by Brown it was under his control legally, whether he saw fit to exercise that control or not. That both the car and the chauffeur were treated as under his actual control appears from the fact that he used the chauffeur to assist in getting the campaign literature into the car and in posting it up at different places where they stopped, and that, without asking any consent of the chauffeur, Brown took three or four of his companions into the car to ride with him.

I think the verdict of the jury, so far as it rests upon the proposition that Mrs. Saperston was the principal controlling the conduct of the chauffeur, and not Brown, is against the weight of the evidence, and that the verdict should be set aside, and a new trial ordered.