AUTIO, ADMINISTRATRIX, RESPONDENT, *v.* MILLER, APPELLANT.

(No. 6,857.)

(Submitted December 3, 1931. Decided February 15, 1932. Opinion on Rehearing filed May 20, 1932.)

[11 Pac. (2d) 1039.]

*Messrs. Kremer, Sanders & Kremer,* for Appellant, submitted a brief; *Mr. J. Bruce Kremer* argued the cause orally.

154

*Mr. H. J. Freebourn* and *Mr. Henry Levinski,* for Respondent, submitted a brief; *Mr. Freebourn* argued the cause orally.

156

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

This is an appeal by the defendant from a judgment in favor of plaintiff, after defendant's motion for a new trial had been overruled. The subject matter of the action is a claim for damages brought by plaintiff, as administratrix of the estate of her eight year old son, killed by an automobile driven by defendant.

In an opinion promulgated February 15, 1932, a majority of the court reversed the judgment and directed a dismissal of the action. A motion for rehearing was filed, and objections were filed thereto. Being doubtful of the correctness of our decision, we asked for and were favored with oral arguments

upon the motion. After due consideration we now withdraw the opinion, and substitute this one in lieu thereof.

The complaint charges that the defendant failed and neglected ▮ to keep a proper lookout, or any lookout, in the driving and operating of his automobile; that he drove his automobile at an excessive rate of speed, to-wit, at about 35 or 40 miles per hour, and struck the boy when driving at that rate; that he failed to give any warning or signal whatever; that he failed and neglected to have the automobile under proper control so as to stop in time to prevent striking the boy; that he was negligent by failing to run his automobile "in a reasonable and proper manner and at a rate of speed no greater than was reasonable under the conditions existing at the point of operation, taking into account the amount and character of traffic, condition of brakes, weight of vehicle, grade and width of highway, condition of service and freedom of obstruction to view ahead and so as not to endanger the life, limb and property of persons entitled to the use of said highway, and especially so as not to endanger the life and limb of the boy."

A general demurrer to the complaint was overruled and defendant answered denying all of the allegations respecting negligence, and alleging contributory negligence on part of the boy. The plaintiff replied, denying defendant's allegations of contributory negligence.

Defendant's counsel argue that the complaint does not state ▮ sufficient facts, and urge especially that the allegations as to defendant's negligence in failing to keep a lookout are mere conclusions of law. With this we do not agree. The averment that the defendant failed and neglected to keep any lookout in driving his automobile is a terse allegation of an ultimate fact. The complaint states a cause of action.

The accident occurred on East Park Street between Oklahoma Street on the west and Covert Street on the east, in the city of Butte. The block is 787 feet in length. Two car tracks run parallel in East Park Street. About midway between Covert and Oklahoma Streets the street-cars stop at a platform

between the tracks, but there is no crossing indicated on Park Street at this point. The distance from the south curb of Park Street to the south rail is 19 feet, and from the north rail to the north curb it is 20 feet. The street from curb to curb is 55 feet wide. Material points are the northwest corner of Sacred Heart School, due south from the platform where the cars stop, and the Manx Bakery, north of Park Street and 50 feet or more east from a line drawn due north from the east end of the platform. The accident happened in the street north of the north track and in front of the bakery. The distance from the west line of the bakery to the west line of Oklahoma Street is 396.3 feet. On the north side of the street there was an ornamental street light 58 feet west of the Manx Bakery, and a similar light 108 feet to the east of the first light mentioned; on the south side of the street there were similar lights opposite those on the north side.

The defendant, driving a Master-Six Buick coupe, was returning from Meaderville where he and three friends, passengers in the car, had partaken of dinner. It was about 8:30 P. M.

The boy was returning home from a moving-picture show. His mother had often told him to look out for cars before starting to cross a street. He did not appear to be any different from other boys of his size and age. "He was pretty smart," a normal boy; had attended school for a year and a half.

The witnesses for the plaintiff who saw the accident were Mrs. Godbout and Waino Aho. Mrs. Godbout testified that just prior to the accident she observed a little boy running diagonally (northeasterly) across Park Street, and at the same time she saw a car coming from the west, and there was another car behind it. When she first saw defendant's car it was near the Montana Meat Shop, which is about 300 feet from the Manx Bakery (later she said the car was about 200 feet distant from her when she first saw it), and the Autio boy was then at the southwest corner of the Sacred Heart School (on the south side

of the street). She imagined the car was coming between 30 and 40 miles an hour. The boy stepped off the curb and ran, not very fast, across the street, east of the platform, until he reached the northerly tracks "and the little boy kind of hesitated between the north and south tracks, just probably a fraction of a second or so, and then went on again." He looked east, which was toward the approaching automobile. Then he started to run again, not very fast. "As the car came down the street and before it struck the boy, it was traveling between the rails on the north side of the street for a short distance, and then as it got down closer to the bakery it swerved over a little to the north, out of the track. It was traveling between the rails until it got a short distance from the bakery and then it swerved to the north side of the street." The witness thought the boy started ahead about the time the car swerved. "At the time the boy was struck, he was just a little bit north of the north rail. He was then between the north rail and the north curb. When he was struck, he was directly in front of the entrance to the Manx Bakery." She designated the spot where the boy was struck by an "X" on Defendant's Exhibit No. 2. This point is closer to the north curb than it is to the north track.

The witness Aho saw the accident from his position on the south side of Park Street. He saw the boy leave the curb and, rather walking than running, it seemed to him, go across the south side of Park Street, and stop when he was between the upper (the north) car tracks. The boy stopped and then started again. "When he stopped it looked like he was going to make fast steps and then the car was there too just about the same moment. * * * The car was traveling pretty lively all right. I can't say exactly how fast it would be, somewhere about 40 or 45 miles per hour. On the same instant I was looking at the boy last when I seen him make the fast steps. I seen the car and it looked to me it is going to be accident right there. The car was down to the track when the boy stopped. He looked like that and he made fast steps. The car was com-

ing and it was right at the boy in a few moments. The boy was trying to run off the street for the sidewalk, trying to get on the north sidewalk. He ran in front of the car naturally in getting across the street where the car was coming. It was like this where the boy was standing and the car was coming along the tracks on the same line. When I noticed the car there he started making fast run. It seems like the car made a turn at the same time. When the boy made the dive the car made the turn. The car turned toward the north sidewalk and the boy dived into the street. The car seemed to make the turn at the same time. The boy made a run for the sidewalk and the car turned toward the curb, the north curb.'' The witness thought that, when the boy stopped, the car was not over 30 feet from him. ''The car seemed to be pointed right where he make the steps and the thing happened so quick I can't give exactly, you see. The car seemed to point direct to where he was making the steps. When the boy stopped and before he was struck he didn't do anything; he just looked up and seen the lights and it looked like he got scared of that car and it looked like he was going to beat it to the sidewalk, that is the way it looked to me. The boy when he stopped was in front of the automobile as it was coming and before it made the turn. It was right on the same line; the car was coming in the middle of the street and the boy was standing there. The place where he was hit was out of the line of the car before it turned. The boy was cutting across the street.'' He said if the car went straight on the track ''I think the boy would get to that side. The boy made fast steps and the car turned and they came together right there. The car had turned toward the north to try to avoid the boy.''

The witness Godbout did not give any testimony whatever respecting her use of or familiarity with automobiles. As to Aho's ability to judge of the speed of a running automobile, he said he had driven an automobile a little bit but never owned one. He thought ''a person upon a sidewalk is as good a judge as a person riding in an automobile as to the speed at which it is going.''

Defendant's witnesses described the occurrence as they remembered, and gave other estimates of speed.

Mrs. Matson said her husband had turned from Oklahoma Street into Park ahead of defendant's car. Matson's car is old and was not exceeding 10 miles an hour. When defendant set about to pass Matson's car, the two ran side by side for some distance, then defendant's ran ahead, turning to the right to get ahead of Matson.

Mr. Matson said, in substance, that he came cautiously from Oklahoma into Park, which is a heavily traveled street. He saw a car coming along about half a block away and turned in ahead of it. About halfway between Oklahoma Street and the Manx Bakery the car started to pass him. Matson was then traveling about 10 miles an hour, defendant not over 18 miles an hour. Matson was about 15 feet behind defendant when the boy was hit.

In the defendant's car the passengers were seated thus: Miller driving; Miss Mullins at his right; on the back seat, Fenton, directly behind Miller; Boggio at Fenton's right. Miss Mullins and Boggio were carrying on a conversation, and neither was observing the road.

Boggio lives at Red Lodge and is a repairman in charge of telephones throughout the entire county of Carbon. He drives a car about 100 miles a day. He said that when the car hit the boy it was not going over 15 or 20 miles an hour. Miller was a cautious driver and going along slow. It was not over 20 miles an hour.

Fenton is postmaster at Laurel. He was one of defendant's companions. He has driven cars and felt himself competent to make a reasonable judgment of the speed of automobiles. "From the time we left Meaderville until the accident the maximum speed at which Mr. Miller drove his car was between 15 and 20 miles an hour, I imagine. I was looking right over Mr. Miller, looking west and just in the light of the car, just about room for two steps to the left I saw a boy with his head down as if he were running and he took about

two steps just the minute I saw him. I just knew what was about to happen when I said, 'Look out, Ed'; in the same instant when I saw this I hollered, 'Look out, Ed.' '' There was a thud, and the brakes were applied. The car stopped within a full length, and he saw the boy behind the car. Miller immediately parked at the curb, went back, got the boy, and took him to the hospital. Mr. Miller was not conversing with anybody when the accident occurred; he was paying attention to his driving; he stopped the car immediately after he hit the boy. The witness felt that defendant was not at fault.

Defendant testified that he had driven cars for about 20 years and this particular car for 18 months or two years. When he was passing the Manx Bakery he was going at the rate of about 15 miles an hour. ''The first I knew,'' he said, ''I was driving along there looking ahead, this child was within—Oh, I just saw him the instant the car hit him; he was coming along with his head down and coming fast. The best way I could say this—perhaps you play football or you have been football players, men who buck the line, they get down low, and this child was coming along with his head down. He was moving rapidly. Immediately upon seeing this child approaching my car I applied my brakes and stopped the car. When I stopped the car I looked for a place to drive into the curb and there was a car or two there and I pulled into the curb, jumped out of the car, rushed back to the child and picked him up, then took him to the hospital. * *· * I don't know where the boy came from. I heard Mr. Fenton call, 'Look out, Ed.' At the time he called I saw the boy at practically the same time. It all happened simultaneously. Q. How far was the boy from your car approaching you in the manner in which you indicate when you first saw him? A. Well, the car was right on him; perhaps he would have been anywhere from a foot to three feet, just practically a step. There wasn't anything I could do that I didn't do to avoid striking him. There was no way. If I had been speeding he could not have gotten in front of the car; he would have

hit the side of the car if I had been just a little bit faster. Instead of being in front of the car he would have hit the side of the car.''

No one in Matson's car saw the boy before the accident. In defendant's car only Fenton and defendant saw him, and then when the boy was too close to avoid striking him.

It is to be borne in mind at the threshold that the fact alone that a collision occurred does not of itself show either that the defendant was negligent or that plaintiff's intestate was guilty of contributory negligence. Under our present system, liability for loss caused by automobile accidents is based entirely on fault. If the operator of an automobile ''has by his fault caused injury or death, liability to pay damages is imposed on him and on anyone in whose behalf he was operating, unless the victim of the accident was himself at fault in any degree, in which event there is no liability.'' (Ballantine, ''Compensation for Automobile Accidents,'' American Bar Association Journal, April, 1932.)

When we analyze the evidence in view of the presumption that the judgment is correct (*Mulholland* v. *Butte & Superior Min. Co.,* 87 Mont. 561, 289 Pac. 574; *Kosonen* v. *Waara,* 87 Mont. 24, 285 Pac. 668; *Downs* v. *Nihill,* 87 Mont. 145, 286 Pac. 410), as we must, it shows that, as defendant's car passed Matson's, defendant turned to the right, the north, to get in' ahead of Matson, and simultaneously the boy started across the street in an attempt to reach the north sidewalk. That the boy ran into, or tried to pass ahead of, the car is incontrovertible.

The element of speed, one base of the alleged cause of action, of which a great deal was said in the trial court, repeated here in argument, is of little consequence when the whole case is summed up.

The rule is that to prove one liable for such negligence it must be shown that the excessive speed was the proximate cause of the injury. (Schwartz's Trial of Automobile Accident Cases, sec. 219; Berry on Automobiles, 4th ed., sec. 178;

Huddy on Automobiles, 5th ed., sec. 304; 2 Blashfield's Cyc. Automobile Law, pp. 1221, 1222.)

When we consider that, calculating roughly, a car covers one and one-half times as many feet per second as it travels miles per hour, if the car were 200 or even 300 feet from the scene of the accident and the boy were then leaving the curb in front of the Sacred Heart School, having from 55 to 65 feet to cover before reaching the point of collision, the car running from 30 to 40 or 45 miles per hour, it is clear that the car would have passed the point of collision before the boy arrived there. The physical facts prove this. No one says the boy ran fast from the south curb to the north track. Aho says he went slowly. The mathematical facts, based on the testimony of Mrs. Godbout and Aho, prove their estimates incorrect, and confirm in a measure the estimates given by defendant's witnesses. The testimony also shows that the boy was running diagonally across the street in a northeasterly direction. This being so, he could not (unless he shut his eyes) avoid seeing the Matson and Miller cars running westerly along the road he intended to cross. Both cars were running with lights.

But at this point we did not give sufficient consideration to an essential point in the succession of circumstances. We assumed that all the essential facts were one way and that under the law the evidence was susceptible of but one conclusion by reasonable men (*Marsh* v. *Ayers*, 80 Mont. 401, 260 Pac. 702; *Boyd* v. *Great Northern Ry. Co.*, 84 Mont. 84, 274 Pac. 293), and that in favor of defendant. The facts in this case are exceedingly close. Plaintiff's witness Godbout testified that the boy reached the north track and there stopped, or at least hesitated for "a fraction of a second or so." Aho said he stopped. In passing the Matson car defendant's car ran on the north track and for a short period of time was running directly toward the boy. It was not over 30 feet from him. If the car was running 20 miles an hour, it would be upon him in a second. The jury might reasonably have

inferred that the boy thought himself in imminent peril, and, because of fright, he sprang into the street in an effort to reach the north curb, and thus ran in front, or directly into, the oncoming car. The defendant did not see the boy when he was standing on the track. He did not see him until practically the instant of contact. The driver must look "not only straight ahead, but laterally ahead." (*Hornbuckle* v. *McCarty,* 295 Mo. 162, 25 A. L. R. 1508, 243 S. W. 327, 329; Huddy on Automobiles, 8th ed., p. 384, sec. 369.) "Moreover, a person is presumed to see that which he could see by looking. * * * He will not be permitted to say that he did not see what he must have seen, had he looked," as Mr. Justice Toole said in *Grant* v. *Chicago, M. & St. Paul Ry. Co.,* 78 Mont. 97, 252 Pac. 382, 386. "The duty to keep a lookout includes the duty to see that which is in plain sight." (*Pollard* v. *Oregon Short Line R. Co., ante,* p. 119, 11 Pac. (2d) 271.)

Had he looked, defendant would have seen the boy approaching the north track. Another point which must not be disregarded is that when a driver is passing another car he must exercise vigilance commensurate with the surrounding conditions. Whether, had he seen the boy approaching the north track or stopping thereon, the tragedy might have been averted, we cannot say as a matter of law. It is true that a driver seeing a person in a place of safety is not called upon to presume that the person will rush into a place of danger. While the driver of an automobile is required to be vigilant, he is not bound to anticipate that a child will suddenly dart from the side of the street, or suddenly run across the street, in front of his car. (*McMillen* v. *Strathmann,* 264 Pa. 13, 107 Atl. 332; *Leslie* v. *Catanzaro,* 272 Pa. 419, 116 Atl. 504.) But if he is not vigilant, if he does not keep a lookout, the jury may say he was negligent.

The court told the jury in instructions given, without objection, that, if they found from the evidence that the deceased was guilty of contributory negligence which proximately caused or contributed to his injuries and death, then

they should find their verdict in favor of the defendant, regardless of whether defendant was guilty of negligence; that, if the jury found that both the boy and the defendant were negligent and that such negligence proximately caused or contributed to the injuries and death, sustained by the boy, then the plaintiff could not recover, and the verdict should be in favor of the defendant.

They were told also that, if they found from the evidence that the boy sustained injuries as the direct and natural result of an inevitable accident, or as the direct and natural result of his own contributory negligence, their verdict should be in favor of the defendant; that a child is bound to exercise only the care that those of his own age and understanding would exercise, and that, if the boy at the time of the alleged injury exercised such care as a reasonable person of his age would exercise under the circumstances of the case, then he was not guilty of contributory negligence, which would defeat plaintiff's right to recover in the action, but, if from the evidence they found that the deceased was guilty of contributory negligence which proximately caused or contributed to his injuries and death, then their verdict should be in favor of the defendant.

The court gave appropriate instructions as to the right of a pedestrian and an automobilist to the use of the street, substantially in accordance with the rule laid down in *Green* v. *Bohm,* 65 Mont. 399, 211 Pac. 320, *Carey* v. *Guest,* 78 Mont. 415, 258 Pac. 236, and *McKeon* v. *Kilduff,* 85 Mont. 562, 281 Pac. 345, following that with an instruction to the effect that a person driving an automobile on a city street has a right to assume that no pedestrian will cross it at any other point than a designated crossing, and the automobilist may proceed upon that theory. But this does not relieve him from exercising due care under the circumstances.

If it be conceded that the boy did not exercise such care as a reasonable person of his age would exercise, the jury might have seen fit to excuse him under the emergency rule, which, as stated by this court, is that one who, in a sudden emergency.

acts according to his best judgment, or who, because of want of time in which to form a judgment, omits to act in the most judicious manner, is not chargeable with negligence. Such act or omission may be called a mistake, but not carelessness. (*Peabody* v. *Northern Pac. Ry. Co.,* 80 Mont. 492, 261 Pac. 261, and cases cited; and see Blashfield's Cyc. Automobile Law, pp. 274, 275.) But upon the facts in this case the rule does not apply to defendant for the reason that the jury was warranted in believing he was negligent in not seeing the boy until the instant of the impact. We have in mind that, as a general rule, the issues of negligence and contributory negligence must be decided by the jury under appropriate instructions (*Marsh* v. *Ayers,* supra; *Kakos* v. *Byram,* 88 Mont. 309, 292 Pac. 909), and the settled rule is that a case should not be taken from the jury unless it follows as a matter of law that plaintiff cannot recover upon any view of the evidence, including the legitimate inferences to be drawn from it; every fact will be deemed proved which the evidence tends to prove. (*Wingate* v. *Davis,* 77 Mont. 572, 252 Pac. 307; *McCabe* v. *Montana Central Ry. Co.,* 30 Mont. 323, 76 Pac. 701; *Boyd* v. *Great Northern Ry. Co.,* supra.)

Counsel for defendant argue that the court erred in permitting an actuary to testify to the expectancy of life of the decedent, based upon the Carlisle Mortality Table. As long ago as *Stephens* v. *Elliott,* 36 Mont. 92, 92 Pac. 45, this court held that in personal injury cases standard mortality tables were admissible in evidence for the purpose of showing the probable expectancy of life. (And see *Robinson* v. *Helena Light & Ry. Co.,* 38 Mont. 222, 99 Pac. 837.)

The Standard American Expectancy Mortality Table does not treat of life expectancy below 10 years of age. The Carlisle Mortality Table contains a tabulation of individuals from one year old up, but it is apparent from an inspection of this table that the services of an actuary are necessary to compute life expectancy therefrom. Defendant's counsel say there was no competent evidence that the Carlisle table is a

standard or recognized table, but the authorities hold to the contrary.

In 1 Jones' Commentaries on Evidence, at pages 804, 805, it is said that the Carlisle Mortality Table has been noticed and treated as standard. (And see 4 Jones' Commentaries on Evidence, at page 3198, note 19.)

In 19 R. C. L. 222, it is said the courts recognize as standard and constantly use the Carlisle table. "Mortuary tables, to be admissible in evidence, must be tables of established repute, such as the Carlisle tables." (17 C. J. 1356; and see Giaque & McClure's Present Value Tables, p. 1.)

The court did not err in admitting the testimony. The court told the jury that the boy's expectancy after reaching the age of 21 was 37.24 years, but warned them in an instruction immediately following that in considering earning capacity they should consider the fact that as age advances physical strength and earning capacity diminish; that standard mortality tables showing the expectancy of life of a given age are competent for the purpose of showing the probable length of life of any given person, but in the nature of the case cannot be conclusive. Other matter in the instructions does not require comment.

The court also advised the jury that in determining the amount of damages "for the impairment, if any, which was caused by the injuries, of the capacity of the said deceased, John Autio, to earn money in the future, if he had not been injured, you are limited to that period of time from and after he became 21 years of age."

The next and a serious objection concerns the size of the verdict, $15,000. It is argued by counsel for defendant that it cannot be accounted for except upon the hypothesis that the jury was influenced by passion or prejudice.

The court instructed the jury that, if their verdict should be for the plaintiff, they should write into that verdict the amount of damages caused proximately to John Autio, and that "in determining this amount you are limited to a sum of money which would have compensated John Autio for the

pain and suffering of mind and body which the injuries caused (if any such pain and suffering were caused), between the time he was injured and the time he died, if he survived the injuries for any length of time, and to the further sum that would have compensated him, unless you find that his death was instantaneous, for the impairment, if any, which was caused by the injuries, of his capacity to earn money in the future if he had not been injured." This instruction, based upon that given in *Beeler* v. *Butte & London C. D. Co.*, 41 Mont. 465, 110 Pac. 528, was given without objection, and there was no request for any other instruction upon the subject.

It must be borne in mind that this is not a suit brought by a parent. It is one brought by decedent's estate to recover damages for personal injuries suffered by the boy and for the impairment of his earning capacity. In fact, it is one for the loss of what he might have earned after he reached the age of 21 years.

There is no substantial evidence showing pain and suffering. The boy was unconscious from the instant of contact, and probably was dead before he was placed in defendant's car. The verdict is high, very high. But we are unable to say from anything that appears in the record that it is the result of passion or prejudice. In cases where damages are sought for personal injuries, resulting in the death of young children, as a matter of course there can be little evidence upon which a jury can fix damages upon a basis approaching accuracy.

At the time of his death, decedent did not have any earning capacity. None can tell what his earning capacity might have been at 21. There is no way to know whether he would have been an idle or an industrious man. The legal writers say there are no recognized criteria of the value of pain and suffering, or of life. (Ballentine, supra; 25 Columbia Law Review, p. 164 et seq., at p. 174.)

The fact is that verdicts in cases like this are necessarily speculative and hypothetical. But, as was said in *Houghkirk*

v. *Delaware & Hudson Canal Co.*, 28 Hun (N. Y.), 407, the difficulty is, "By what test are we to review them? If it is a matter of guesswork, the jury can guess as well as we. If we are to review them by the test of the evidence, then the difficulty is, that there is no direct evidence proving the amount of loss." (See Tiffany on Death by Wrongful Act, sec. 164.)

We find in Parmele's Damage Verdicts, section 495, that verdicts have been sustained in similar cases running from $15,000 to $500. The majority of cases runs from $6,000 to $2,000. A large number run about $5,000.

In *Conway* v. *Monidah Trust*, 51 Mont. 113, 149 Pac. 711, 713, in which the boy survived, this court said: "One of the grounds of motion for new trial now vigorously pressed upon us is 'excessive damages, appearing to have been given under the influence of passion or prejudice.' The amount awarded by the jury ($15,000) can be justified only by the assumption that the plaintiff will have no earning capacity whatever after he reaches the age of majority. But this, if unwarranted, does not necessarily evince passion and prejudice; it is rather a miscalculation, the result of which is subject to correction, under the principles announced in *Chenoweth* v. *Great Northern Ry. Co.*, 50 Mont. 481, 148 Pac. 330. At the time plaintiff fell into the unguarded shaft, he was seven years old, and that he sustained some injury in consequence of his fall is not and cannot be disputed. There is evidence to show that the injury is serious, probably permanent, possibly progressive. From present indications it will handicap him and diminish his earning capacity to some extent after he reaches his majority; but that the result will be a total loss of earning power there is not, in our judgment, any sound basis in the record for saying. This being so, we think that $10,000 will afford ample compensation for such injuries as the evidence establishes with reasonable certainty."

We quote again from what is said in *White* v. *Chicago, M. & P. S. Ry. Co.*, 49 Mont. 419, 143 Pac. 561, 564: "In the very nature of things there can be no fixed measure of com-

pensation; nor may the award in any given case be accepted as a conclusive standard in any other case, because, it being the province of the jury to determine what the amount shall be, the sums awarded in different cases vary as widely as do the individual views, capacities, and dispositions of the men who constitute juries, chosen, as they are, by lot from the body at large of the citizens of the community. So long as we have a system which confides to juries the duty to determine the issues involved in this character of cases and to fix the amount of compensation to be paid, unless the result of their deliberation is such as to shock the conscience and understanding, it must be accepted as conclusive." (*Staff v. Montana Petroleum Co.*, 88 Mont. 145, 291 Pac. 1042, and see *Lewis v. Northern Pac. Ry. Co.*, 36 Mont. 207, 92 Pac. 469.)

A study of the law bearing upon this class of cases leads the writer to call attention to the inadequacy of the present system of compensating persons injured by automobiles. The following brief discussion is *obiter*, but this court has time and again called to the attention of the legislative assembly questions of public importance, the correction of which is within the legislative, but not within the judicial, power.

The automobile has become essential to our commercial and social life, and, as was remarked by Mr. Justice Sanner in *Lewis v. Steele*, 52 Mont. 300, 157 Pac. 575, 578, "is now too well established to be singled out for judicial preference or animadversion." Nevertheless, it is an instrumentality which requires care and prudence in operation.

Not many years ago it was said that "the outstanding safety problem of the nation is the rapidly growing number of fatal and crippling accidents caused by the ever increasing number of motor vehicles upon the public highways." (Robert S. Marx, 25 Columbia Law Review, 164.) This year it is said: "The problem of compensation for motor vehicle accidents involves every year in the United States over a million persons injured and the families of more than 30,000 killed." (Compensation for Automobile Accidents, supra.) This alarming condition is here, but a satisfactory remedy

for it has not been found. The personal injury suit is available, but forward-minded thinkers are generally of the opinion that such suit alone is far from an adequate remedy and, in the public interest, must be supplanted by a system more in harmony with the needs of the present era. In an article in the American Bar Association Journal for November, 1930, Mr. Wilcox, Chairman of the Industrial Commission, of Wisconsin, says that some way must be found to insure reasonable distribution of the social and economic loss resulting from automobile accidents. "The personal injury suit is the only course yet provided and this course, as it works out in practice, is just an excuse and not a remedy." (And see Marx, Columbia Law Review, 164; Ballantine, American Law Association Journal, April, 1932.)

It is obvious that the victim of a financially irresponsible and uninsured motorist has little chance of receiving any compensation for his loss. In this state anyone, except those who engage in the business of operating motor vehicles for hire (Chap. 184, Laws 1931), can obtain a license to operate an automobile without restriction, and approximately one out of every five of our residents owns an automobile. A very large proportion of these automobile owners are not able to respond in damages for injuries done, and these are quite as likely to cause injury as are those who are financially responsible or are insured. The result necessarily is that a large, probably the larger, portion of those injured are without any remedy whatever.

Criticism of the personal injury suit as such is not made nor intended. What is here said has reference only to the adequacy of its operation in the wide field of automobile accident cases.

As to how the present system distributes losses, see American Bar Association Journal, April, 1932; 25 Columbia Law Review, 164.

The same problem exists in all of the states. Six states limit the amount of the verdict. Massachusetts has a law making insurance compulsory. A number of states have

adopted laws requiring automobilists, usually limited to those carrying passengers for hire, to give an indemnity bond or to carry private liability insurance as a guaranty of financial responsibility. Some states require one taking out a license to operate an automobile to put up an indemnity bond that he will pay any judgment that may be rendered against him because of an accident caused by himself or his agent. And see "Automobile Accidents," a comparative study of the law of liability in Europe, by Francis Deak, 79 University of Pennsylvania Law Review, page 271.

Enough has been said to show that it is high time for us in Montana to give some constructive thought to this important social, economic, and legal problem.

Until some better system is devised, the courts must construe the law as it appears to be, with the intent always of arriving at substantial justice so far as that is possible under the conditions presented for decision.

The judgment is affirmed; remittitur forthwith.

ASSOCIATE JUSTICES GALEN and MATTHEWS concur.

ASSOCIATE JUSTICES FORD and ANGSTMAN: We agree with everything stated in the above opinion except that we express no opinion as to the desirability of devising a different system for the distribution of loss occasioned by automobile accidents.