ANNA McDERMOTT v. RADI RALICH AND OTHERS.[1]

March 31, 1933.

No. 29,122.

[1]Reported in 247 N. W. 683.

502

*Samuel Lipschultz,* for appellants.
*Reynolds & Smith,* for respondent.

DIBELL, JUSTICE.

Action to rescind on the ground of fraud a contract whereby the plaintiff bought of the defendant Radi Ralich, his wife, Pauline Ralich, joining in the contract, a vacant lot in St. Paul, and to recover so much of the purchase price as she had paid. The defendants G. J. Baker and K. C. Boehmer, copartners as G. J. Baker & Company, were charged, as agents of the defendants, with the making of fraudulent representations inducing the purchase. They appeared at the trial by counsel but were not witnesses. There were findings for the plaintiff against all of the defendants. The defendants Radi Ralich and his wife appeal from an order denying their motion for a new trial. The defendants Baker & Company do not appeal. These considerations are involved:

(1) Whether fraud was committed which induced the plaintiff to purchase the lot.

(2) Whether there were statements promissory in character made with the intention of not keeping them and which constituted fraud.

(3) Whether the defendant Radi Ralich participated in the fraud.

(4) Whether a cause of action was proved against Pauline Ralich, the wife of Radi Ralich.

(5) Whether, if a cause of action was proved against Radi Ralich, but not against Mrs. Ralich, their joint motion for a new trial was available to Mrs. Ralich.

■ Under date of September 3, 1930, the plaintiff and the defendant Radi Ralich, his wife joining, entered into a written contract whereby she was to purchase and he was to convey lot 15, block 1, Midway Highland Park Addition to St. Paul, for $4,275, of which $1,500 was represented by $1,500 of the Northern States Power Company stock of the par and actual value of that sum, and the rest of the purchase price was to be paid in instalments of $40 a month commencing October 5, 1930. Four, aggregating $160, were paid on their due dates. Soon after the last the plaintiff assumed to rescind on the ground of fraud, and her rescission was effective if fraud was practiced upon her by Ralich.

As we get the facts, which come through confused and uncertain testimony, negotiations for the sale of the lot were commenced a few days prior to the contract. The plaintiff operated a small grocery store in the residential portion of the city which had come to her upon the death of her husband four or five years before. She was not a skilled business woman. The facts of the case evidence this. She had some property, apparently was buying stock and other property, and was anxious for large profits and was susceptible to attractive inducements. The first she heard of the lot involved was through one or more telephone conversations with an unidentified woman. Soon afterwards, September 2, 1930, a man came to her place with an automobile, and she and a lady friend went with him to the vicinity of the lot, where a sort of a sales office was maintained in an old homestead residence. An intensive plan of

selling was going on. The last of the platted subdivision was being sold, and the last chance of buying was near, or at least that was the impression given. The property was at the outskirts of the city, and there were practically no houses immediately adjacent. When the plaintiff was taken there a lunch was served; then there was a "lecture" in which the prospects of the property as a financial investment were told in terms suggestive of large and quite immediate profits. After the "lecture" Mrs. McDermott with her lady friend were driven, apparently by one Trowbridge, to the property which was finally purchased. It was represented to her as about the best piece of property left. She was shown around and then driven back to the sales office. There were perhaps 25 or 30 people around at the time of the "lecture" and luncheon. Frequently salesmen called out that certain pieces of the property which had been for sale had been sold. The opportunities to buy were dwindling. Mrs. McDermott had a private interview with one of the men, probably Drushell, and it resulted in an informal memorandum of September 2, 1930, put in the form of a receipt and signed by Mrs. McDermott and Drushell on a printed form headed "G. J. Baker & Co." She was then driven by Drushell to her home, although she had offered to go to a street car and from there home, and gave him $900 in Northern States Power Company stock; and the next day she was driven by him downtown and took $600 of Northern States Power Company stock from her safety deposit vault and gave it to him as part of the purchase price. Then the $40 a month payments were to commence and be continued with interest until all was paid. The court finds that the value of the lot was $1,200.

A fair understanding of the situation is given by the amended findings of the trial court:

"That on or about the second day of September, 1930, said defendants, G. J. Baker and K. C. Boehmer, through their duly authorized agents, and employes, and acting as the agents of defendant Radi Ralich, did the following things, to-wit:

"Called for plaintiff in an automobile at plaintiff's residence and conducted said plaintiff in said automobile to the subdivisions hereinabove mentioned and described.

"Brought her into a house located upon or near to said subdivisions, furnished a luncheon, and thereafter gave a talk, which talk was by them referred to as a 'lecture,' in which talk, or lecture so-called, the speaker stated that the real estate in that district had attained a great and unusual value, that a great and unusual development of that district was in progress, that the land in said district would attain in the immediate future an enormously increased value and that there was then a present opportunity for the owners and purchasers of the land in said district to make a large amount of money in the immediate future by reason of the great development and increased value of said land which was to immediately occur and take place.

"Conducted plaintiff into a small room after said talk was at an end, and seated her across the table from one of the salesmen employed by said defendants, G. J. Baker and K. C. Boehmer, who then and there stated and represented to plaintiff in substance, as follows:

"That said lot 15 in block 1, in Midway Highland Park Addition was at that time of the actual value of $4,275; that the owners of lots immediately surrounding the lot above described intended to build fifty houses right away in the immediate neighborhood of said lot, and, that there was at that time contracts let and permits issued for the construction of said fifty houses; that the owner of a lot adjoining said lot 15 intended to build a commercial building upon said adjoining lot and start up a business therein immediately; that it was the present intent of the defendants, G. J. Baker & Co., to place an oil filling station upon said lot 15 in the spring of 1931, and pay to the purchaser of said lot a monthly rental of not less than $150, and guaranteed that plaintiff would realize $150 per month from this filling station, which they would erect in the spring if she purchased the lot; that the value of said lot would continually from that date greatly and enormously increase over the said alleged value of $4,275."

And further the amended findings are:

"That the statements made by said agents, salesmen, and employes above set forth were each and all of them false and were known by them to be false and were made solely for the purpose of defrauding the plaintiff. That said lot faces on St. Paul avenue and Montreal avenue; that said St. Paul avenue is 104 feet wide, and said Montreal avenue is 90 feet wide; that said lot has a frontage of 99.73 feet on St. Paul avenue. That said lot, during all of times hereinabove mentioned, lay and still lies in an isolated district; no houses whatever have been built in the entire subdivision in which said lot lies; the land across the street, south of said lot, is unplatted acreage; the nearest building west of said lot is the Ford assembly plant, at least a half mile from said lot; the only buildings which could be said to be in the neighborhood of said lot are an old and dilapidated building and the so-called Saunders homestead, where the 'lectures' so-called, were being had; no change or development of any kind has occurred in the neighborhood of said lot since September, 1930; the value of said lot did not exceed $1,200 and said value has not increased; said lot was not then and has not since become suitable for any manner of commercial business; at the time of the making of the statements and representations, hereinabove set forth, there was no intention on the part of any person or persons to build a commercial building adjoining said lot or to build fifty houses in the immediate neighborhood of said lot; nor did G. J. Baker & Co. intend to build an oil filling station upon said lot in the spring of 1931, nor did it believe or intend that the purchaser of said lot could or would obtain $150 per month from a filling station thereon, nor did it intend to carry out its guarantee to that effect; the purchase of said lot by plaintiff for said purchase price was an improvident transaction for plaintiff.

"That all of these things were well known to said salesmen, agents, and employes and that they deliberately, maliciously, and wilfully made the false and wrongful statements above set forth, and made them in an exaggerated and forceful manner in order to impose upon and defraud the plaintiff and with the intent that she should be-

lieve such statements as statements of fact, and rely thereon. That the plaintiff considered and accepted such statements as statements of fact and relied upon and believed such statements and was induced thereby to execute the instrument above set forth and deliver the stock and pay the moneys as above alleged and that she would not have done such things had such false statements not been made."

The findings recited are sustained by the evidence. Some of the representations were positive misrepresentations of fact and were of themselves enough upon which to base a rescission.

■ Some of the representations constituted no more than trade talk. In themselves they are insufficient as a basis for a rescission. Some were promissory in character. If made with the intent that they would not be fulfilled they were the basis of a rightful rescission for fraud. Albitz v. M. & P. Ry. Co. 40 Minn. 476, 42 N. W. 394; Nelson v. Berkner, 139 Minn. 301, 166 N. W. 347; Smith v. Vosika, 163 Minn. 12, 203 N. W. 428; Guy T. Bisbee Co. v. Granite City Inv. Corp. 159 Minn. 238, 199 N. W. 14; Maguire v. Maguire, 171 Minn. 492, 214 N. W. 666, 215 N. W. 522; 3 Dunnell, Minn. Dig. (2 ed. & Supp.) § 3827.

The evidence justified the trial court in finding that no one had in mind the building of 50 or 60 houses in the vicinity, that the erection of a commercial building was a myth, and that a filling station which would produce a rental of $150 per month was a bare fraud, though promissory, because never intended. If the testimony of the plaintiff and that of her witnesses was believed, there was clearly fraud justifying rescission.

■ The most difficulty is in finding whether Ralich was connected with the fraud found. He did not deal directly with Mrs. McDermott. She gives testimony to the effect that Ralich came to her after the sale was perfected relative to the sending of the instalment checks. Her testimony is not convincing upon this point, and probably she is mistaken. There is testimony that after the sale a $40 check, made by her to Baker & Company, was in his possession, evidently a payment of one instalment, and by his direction to her; and, through her, directed that checks in the future be made to him and sent to Minneapolis.

G. J. Baker and K. C. Boehmer were copartners as G. J. Baker & Company in the real estate business and had an office in St. Paul. Mr. and Mrs. Ralich lived in Minneapolis. The contract for the sale of the lot under date of September 3, 1930, specifically set forth the terms of the sale at $4,275, $1,500 in cash and $40 or more per month on the fifth day of each month beginning October 5, 1930. This contract was signed by Mr. and Mrs. Ralich and by the plaintiff. It was witnessed by M. J. Williams and J. D. Drushell. The memorandum of the day before was signed by Mrs. McDermott and Drushell. Ralich was around the Baker office at times though apparently not frequently. Williams and Drushell were present when the deal was closed. Ralich claims that some days before a man giving the name of Williams, who the evidence shows frequented the Baker offices, telephoned him and asked if he wanted to sell the lot, and upon inquiry as to the price he told him that he wanted $3,000 net. Later one Bacich, an old-time friend, who frequented the Baker offices and shortly before had occupied them, called him by phone relative to the sale, and he came to St. Paul relative to it. There he met Williams, who said: "I buy that lot from you, what you says, $3,000 net to you." Ralich says, in answer to an inquiry as to who bought the lot: "Well, I don't know who bought it. He says he buy that lot from me for $3,000. He never mentioned who buy it." The contract of September 3, 1930, was signed by Mr. and Mrs. Ralich and Mrs. McDermott. Ralich read it through. He saw the name of the grantee. He knew the consideration was $4,275. He read the contract and knew what it meant. Williams paid him $225 or thereabouts. This to some extent supports Ralich's claim that he was to get $3,000 net. The $1,500 paid by the Northern States Power Company stock would leave $2,775 still to come; and the $225 with the $2,775 would be the balance which Ralich ought to have if he got $3,000 net, his sellers getting the rest. But even were this so, it would not relieve Ralich of liability upon the plaintiff's rescission if he insisted upon keeping the benefit of the bargain which was induced by fraudulent representations of his agents. It is not certain that Williams had the $1,500 stock in his actual

possession. It is not unlikely that Drushell had it, and that he, Williams, Bacich, and the Baker organization were instrumental in inducing the purchase; and a finding to that effect is sustained.

The property was originally owned by the Midway Development Company as part of a platted division. When the property was divided Ralich received this lot and a number of others. He was an officer and director of the company at the time of the sale and at one time was president. Baker & Company were actively promoting the sale of the lots which were a part of the platted division. Agency may be proved circumstantially or by evidence which justifies a fair inference of the relationship. 1 Dunnell, Minn. Dig. (2 ed. & Supp.) § 149, and cases cited.

The evidence is far from clear as to the details of the carrying through of the transaction. Necessarily this is so without the testimony of the Baker organization and the men working in connection with the sale. The testimony of Ralich is not always consistent. It may be that it is so partly because he did not understand well or was unable to express himself clearly. In any event the finding of the court that those who induced the sale were acting for Ralich and the conclusion that he was bound by their representations is sustained.

■ There can be no recovery against Pauline Ralich. She joined with her husband in the contract for a deed. She participated in none of the negotiations. She did not receive the purchase money. She did not own and could not convey an interest in the lot. The only purpose of her signing was to bar her so-called inchoate right of dower. She did not make herself personally liable for the return of the money on rescission. If the question is properly raised it must be held that there can be no recovery against her.

■ Mr. and Mrs. Ralich made a joint motion for a new trial. One ground of their appeal is the statutory one that the findings are not justified by the evidence; and they assign as error here the finding of the court that Mrs. Ralich was guilty of fraud or misrepresentation and in effect in holding her pecuniarily liable.

Our holdings have been that a joint motion for a new trial should be denied if the verdict or finding was justified as to any one of the

510

parties making it. Miller v. Adamson, 45 Minn. 99, 47 N. W. 452; McKasy v. Huber, 65 Minn. 9, 67 N. W. 650; Baer v. Kloos, 81 Minn. 218, 83 N. W. 980; Sticha v. Benzick, 156 Minn. 52, 194 N. W. 752. In Bathke v. Krassin, 78 Minn. 272, 80 N. W. 950, a motion stating that each and all would move for a new trial was held to be several as to each of them and the rule inapplicable. In Lyngen v. Tessum, 169 Minn. 304, 211 N. W. 314, a doubt was expressed whether the rule before stated should be followed. And in State v. Kasal, 176 Minn. 86, 222 N. W. 575, it was held inapplicable to criminal cases. The rule as announced in Miller v. Adamson, 45 Minn. 99, 47 N. W. 452, and the subsequent cases following it, is logical enough. It is technical. The bar fails to observe it in many cases, and it is overlooked by the court. The question is now squarely before us with the intimation in the later cases that the rule should not be followed; and we now hold in a case like this that the party against whom a cause of action is not proved may take advantage of the failure although the motion was a joint one.

It seems quite likely that no attention was paid to the question throughout the trial though necessarily it is raised on the motion made, one ground of which is insufficiency of evidence. It is not a case where the defendant concerned should be allowed to tax costs or disbursements. The order denying a new trial will be modified by denying it as to Radi Ralich and granting it as to Pauline Ralich.

Order modified.