HARRINGTON, ADMINISTRATRIX, RESPONDENT, *v.* H. D. LEE MERCANTILE CO. ET AL., APPELLANTS.

(No. 7,213.)

(Submitted March 29, 1934. Decided May 14, 1934.)

[33 Pac. (2d) 553.]

*Mr. E. C. Meservey,* of the Bar of Kansas City, Missouri, and *Messrs. Freeman, Thelen & Freeman,* for Appellants, sub-

mitted an original and a reply brief; *Mr. Meservey* and *Mr. J. P. Freeman* argued the cause orally.

44

*Mr. J. F. Emigh* and *Mr. R. Lewis Brown,* for Respondent, submitted a brief and argued the cause orally.

46

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

This is an action for damages brought by plaintiff, as administratrix, against the defendants, who, plaintiff alleges, by their negligence caused the death of her intestate.

After formal allegations alleging her appointment as administratrix of the estate of Catherine C. Reed, deceased, plaintiff in paragraph II of her complaint averred that at all times mentioned in the complaint, the defendant H. D. Lee Mercantile Company was a corporation engaged in the business of selling clothing in Montana, and that in conducting its business and in furtherance of the same the company had in its employ certain agents, persons and salesmen employed to call upon the customers of the company and solicit them to purchase of the company the merchandise which it had for sale, and in furtherance of the business the company operated and permitted to be operated certain motor vehicles and automobiles, and employed and permitted its agents, servants and salesmen to operate the same, and that at all times mentioned the defendant James Thompson was the agent, servant and employee of the company, by it employed as a traveling salesman, and at the times mentioned Thompson was acting within the scope of his employment and duties as such, and was the driver and operator in charge of an automobile used by the company.

In paragraph III plaintiff described the highway and the condition thereof, including the guard-rails alongside.

In paragraph IV it was alleged that upon the second day of September, 1929, Catherine F. Reed, "at the invitation of, and at the instance and request of the defendants, was riding in an automobile in the charge and possession of the said James Thompson, who was operating and driving" the same, which was then and there being used by the defendant company in its aforesaid business, and that Thompson, while acting as the servant, agent and employee of the defendant, within the course and scope of his employment operated the automobile in a negligent manner, by reason of which the invitee received injuries from which she died.

In paragraph V plaintiff alleged specific acts of negligence, in substance: (1) That the automobile was driven at an excessive rate of speed; (2) that there was a failure to keep any lookout ahead; (3) carelessly, negligently and recklessly driving the car on the left side instead of the right side of the highway; (4) failing to have the car under control.

Other allegations need not be stated.

The company and Thompson filed separate answers. Except that it admitted the death of Miss Reed on information and belief, and the existence of the highway, the company's answer was in effect a general denial, paragraphs II, IV and V of the complaint being specifically denied.

Thompson denied each and every allegation of paragraph II; admitted the existence of the highway and of the guard-rail along the left side thereof; answering paragraph IV of the complaint, he alleged that while in the company of Miss Reed and driving along the highway in a careful, prudent manner, at a reasonable rate of speed not exceeding thirty miles an hour, and on the right side of the road, he suddenly became stricken with a terrific pain in his head, causing him to lose consciousness and not to have the car under control, and that by reason of his unconscious state the automobile was veered to the left and collided with the guard-rail on the left-hand side of the highway, and had it not been for his unconscious

condition the collision would not have occurred. He admitted the death of Miss Reed and that she was employed at the time of her death. He denied the other allegations of the complaint. Plaintiff denied the affirmative allegations of Thompson's answer.

The action came on for trial April 10, 1933. When plaintiff rested her case in chief, each of the defendants moved for a nonsuit, which the court denied. At the close of all the evidence each of the defendants moved the court to direct a verdict against the plaintiff. These motions were overruled. The jury found a verdict in favor of the plaintiff against both defendants in the sum of $18,000, and the court entered judgment accordingly.

The defendants jointly moved the court to vacate and set aside the verdict and to grant a new trial on the grounds, among others, of the insufficiency of the evidence to justify the verdict appearing to have been given under the influence of passion or prejudice, and that the verdict is excessive. The motion was denied. The defendants caused to be settled a bill of exceptions and jointly appealed to this court from the judgment.

Eleven specifications of error, some of which are joint and others several, are presented. Counsel for respondent object to the consideration of any assignment of error which is not common and material to both defendants, on the ground that the defendants moved jointly for a new trial and appealed jointly to this court, and in this court have filed a joint brief and have argued the cause jointly. They say only an assignment of error which is common to both defendants can be held good as to either. There is authority for this position, but it does not find favor with us. We shall not take the time to discuss the consequences of the action of the trial court in overruling the motion for a new trial, except to refer to Montana cases touching the question.

Mr. Chief Justice Brantly, in *Capital Lumber Co.* v. *Barth,* 33 Mont. 94, 81 Pac. 994, observed that: "There is a conflict in the decisions upon the question whether, when a joint motion

is made, the trial court should grant a new trial as to the one or more movants who appear to be entitled thereto (Spelling, New Trial and Appellate Practice, secs. 372, 395), some of the courts holding, as this author points out, that a party having a ground for a new trial loses the benefit of it by proceeding jointly with another who is not so favorably situated. We know of no authority to the effect that all the losing parties may insist upon a new trial because one has ground therefor, which does not in any way affect the merits of the judgment as to the others. Cases may arise where the rights of the losing parties are so intimately connected that what has prejudiced one during the course of the trial may also have prejudiced the other, and the court would feel constrained to grant a new trial as to all in order to remedy the wrong against the one as to whom otherwise the judgment should be allowed to stand. Such were the cases of *Strand* v. *Griffith et al.*, (C. C.) 109 Fed. 597, and *Washington Gaslight Co.* v. *Lansden*, 172 U. S. 534, 19 Sup. Ct. 296, 43 L. Ed. 543. In the first of these two cases there was no evidence to sustain the verdict as against one defendant. The court granted a new trial as to all, for the reason that it could not say that evidence admitted as to transactions between the plaintiff and the one defendant did not enhance the amount of the verdict as to the others. A like situation was presented in *Gaslight Co.* v. *Lansden.*"

Other conditions may easily be brought to mind where the court might in its discretion grant the motion as to one movant and deny it as to another, which this court recognized in *Anderson* v. *Northern Pacific Ry. Co. et al.*, 34 Mont. 181, 85 Pac. 884, 885. In that case Anderson sued the Northern Pacific Railway Company and the Helena & Livingston Smelting & Reduction Company for an injury received by him caused, as he alleged, by the negligence of the two. He recovered judgment against both. Represented by different counsel, each defendant gave a separate notice of intention to move for a new trial. Regardless of intermediate proceedings, it appeared that they joined in the motion for a new trial, which

was denied. There was an attempt to appeal from the order denying the motion for new trial, which this court deemed abortive, and the pretended appeal was dismissed. The defendants gave a joint notice of appeal from the judgment, and one undertaking. It was argued by counsel for the respondent that it was necessary for appellants to join in their assignments of error and that this court could not consider alleged errors not common to both appellants. This court, speaking through Mr. Justice Holloway, said: ''The authorities cited in support of this contention, however, are not directly in point. They are from states where the method of review is by writ of error and refer to cases where joint assignments of error were made. This question has not been before this court directly, but we have heretofore proceeded upon the assumption that proper practice might warrant the affirmance of a judgment as to one joint appellant and its reversal as to another. (*Cook* v. *Gallatin R. Co.*, 28 Mont. 340, 72 Pac. 678; *City of Butte* v. *Cook*, 29 Mont. 88, 74 Pac. 67; *Capital Lumber Co.* v. *Barth*, 33 Mont. 94, 81 Pac. 994.) In the absence of any authorities directly in point to the contrary, we prefer to follow the rule heretofore adopted, or which seems to be implied by the position which this court has heretofore assumed. We, however, adopt the suggestion of counsel for respondent to this extent: That one joint appellant will not be permitted to assume a position in this court antagonistic to his other joint appellant. It was evidently one purpose of section 1721 of the Code of Civil Procedure [1895], in permitting any aggrieved party to appeal, to enable one defeated party to urge an antagonistic attitude as against another defeated party, as well as against the successful litigant, by a separate appeal. But it would seem entirely inconsistent with proper practice to permit one of two joint appellants to assume a position antagonistic to his joint appellant. In so far as the position of either of these appellants is antagonistic to the other, it will not be considered.'' Judgment was affirmed as to the smelting company and reversed as to the railway company.

The *Anderson Case* seems to have been overlooked in *Parnell* v. *Davenport*, 36 Mont. 571, 93 Pac. 939, 940, where there

were two defendants against whom judgment had gone. This court, again speaking through Mr. Justice Holloway, said: "Whether the evidence is sufficient to sustain the verdict as against J. R. Davenport need not be considered. The motion for new trial was a joint motion, and the notice of appeal was a joint notice. In 1 Spelling on New Trial and Appellate Procedure, section 372, it is said: 'A party having ground for a new trial may lose the benefit of it by proceeding jointly with a party not so favorably situated with reference to the proceeding; and, where there is any doubt as to the identity of relation or equality of rights therein, a separate notice should be given, though they be represented by the same attorney.' (*Capital Lumber Co.* v. *Barth,* 33 Mont. 94, 81 Pac. 994)."

In *Cummings* v. *Reins Copper Co.,* 40 Mont. 599, 107 Pac. 904, 907, the question arose again. There, as here, the appellants prepared a single bill of exceptions bringing into the record all the proceedings had during the trial showing the objections and exceptions of the defendants both joint and separate. In disposing of the motions for a new trial the court considered them as a single joint motion. Mr. Chief Justice Brantly said: "Even if the defendants had moved jointly, either had a right to prosecute its appeal from the order denying their motion. The provision of the statute is: 'A party aggrieved may appeal in the cases prescribed in this title.' (Rev. Codes [1907], sec. 7097.) [Compare section 9730, Rev. Codes 1921.] Among the appealable judgments and orders enumerated in the following section is 'an order granting or refusing a new trial.' If the contention of counsel should be sustained, the right to appeal in any case would be made to depend, not upon the statute, but upon the accident that the appealing party had been associated as plaintiff or defendant with another party, and the ability or disposition of such other party to prosecute his appeal." But now there is not any appeal from an order overruling a motion for a new trial, that procedure having been abolished. All questions raised on motion for new trial may now be raised

on an appeal from the judgment. (*Clifton, Applegate & Toole* v. *Big Lake Drain Dist.*, 82 Mont. 312, 267 Pac. 207.)

"A motion for a judgment of nonsuit, or a motion for a directed verdict, is in effect a demurrer to the evidence and presents to the trial court a question of law to be determined (*Neininger* v. *Cowan*, 101 Fed. 787, 42 C. C. A. 20; *Cravens* v. *Dewey*, 13 Cal. 40), and where either of such motions is made in the trial court and overruled, the question of the sufficiency of the evidence to support the verdict and judgment is before this court on an appeal from the judgment." (*La Bonte* v. *Mutual Fire etc. Ins. Co.*, 75 Mont. 1, 241 Pac. 631, 634.)

If a motion for a new trial has not been made, the court will review the evidence to determine whether there is any substantial evidence to justify the verdict. (*Watts* v. *Billings Bench Water Assn.*, 78 Mont. 199, 253 Pac. 260; *Ramsbacher* v. *Hohman*, 80 Mont. 480, 261 Pac. 273.)

In this case the defendants severally moved for a nonsuit. They severally moved for a directed verdict. The verdict rendered against them was a joint verdict, and the judgment rendered against them was joint as well as several. They appeared in this court upon a joint notice of appeal. Some of the specifications of error are by one appellant and some are by the other, and some are joint.

We shall not adhere to the technical rule stated in *Parnell* v. *Davenport*, supra. (Compare *McDermott* v. *Ralich*, 188 Minn. 501, 247 N. W. 683; 20 R. C. L. 224.) For many years we have been liberalizing the rules of practice and procedure in this court, putting aside the ancient rules which occasionally aforetime were permitted to prevent the consideration of cases upon their merits in this court. The question is one of practice only and is not regulated either by statute or court rule. We reaffirm the doctrine of the *Anderson Case*, supra, that on a joint appeal errors not common to both appellants may be considered, although in such case one appellant will not be permitted to assume a position antagonistic to that of the other. An assignment should be

considered as joint and several, or joint or several, according to the nature of the error assigned, and as affecting the respective appellants, as was said by the eminent Justice Christiancy, in *Fisher* v. *Thirkell*, 21 Mich. 1, 4 Am. Rep. 422.

While the company's motion for nonsuit should have been sustained so far as that appellant is concerned, on this appeal we need only consider its specification which is to the effect that the court erred in denying its motion for a directed verdict. This necessitates a brief statement of the evidence.

From some time in 1926 until the date of the accident ▇▇▇ the defendant Thompson was a traveling salesman for the defendant company, which had business houses in a number of important cities, but did not have any fixed place of business in this state. Thompson was assigned the northern part of Wyoming and the southern part of Montana as his "territory." He solicited orders for the purchase of merchandise sold by the company upon prices charged and terms which it fixed. He had not the right to alter prices or to fix terms of sale or to extend credit. Upon acceptance of the orders the company sent the merchandise to the purchaser direct and itself collected the price therefor.

Thompson owned and operated an automobile at his own expense. The company did not have any control over it. The company did not pay any of his expenses. Thompson's compensation was based wholly upon commissions computed on the orders he solicited and which the company honored; nor were any commissions advanced to him. He was expected to cover the territory and sell a certain amount of merchandise during the year, but he was not given any directions as to his course. He pursued his own itinerary and canvassed his territory as he pleased. He did not maintain any headquarters, but it was his custom to stop at his favorite hotel in each city. Thus, while in Billings, he registered at the Northern Hotel; in Bozeman, at the Baltimore; and in Butte, at the Thornton. If requested by the company to go to any certain point, he would follow their suggestion at his early convenience, but he followed his own pleasure in his solicita-

tion of orders. On some occasions he interviewed customers in the evening when it was impractical to see them during the day. He would talk to a customer at any time he would meet him conveniently to advance the business of himself and the company. Social occasions were not barred; if a customer wanted to talk business, Thompson was pleased to talk with him. It was not his habit to work on Sunday, but occasionally he drove from one town to another on that day.

The company manufactured and sold overalls and overall specialties, requiring Thompson to purchase outright a considerable number of samples which he carried in cases in his sedan-style automobile. These were carried upon the back seat and were seldom disturbed. He had the privilege of obtaining a refund for the samples if he chose to return them, or he had the option of selling them to others. He also carried in the back of the car advertising material, evidently furnished by the company, consisting of cardboards and posters, designed to stimulate sales. He registered at the Northern Hotel in the latter part of August, 1929, but went to Bozeman in the morning of August 26. Ordinarily he finished his business in Bozeman in one day, but on that night he was not feeling well; he felt "rather weak and bilious." The doctor called it liver trouble. Thompson spent six days in Bozeman, being in his room most of the time, visiting the doctor four times during that period.

In Butte there lived a Miss Reed to whom he was engaged to be married. On Sunday morning, September 1, she telephoned to him, as a result of which he went to Butte, leaving Bozeman about 5 o'clock in the afternoon, and reaching Butte about 9 o'clock that evening. He felt pretty well during the drive. After meeting Miss Reed, the two took a Mr. Demars to the Northern Pacific depot in Thompson's car, and then, at Miss Reed's suggestion, they went to the Rocky Mountain Cafe in Meaderville, where they danced and had some chicken sandwiches. Meeting another couple, the party remained at the Rocky Mountain Cafe until about 1 o'clock in the morning, when Thompson and Miss Reed started to return to

Butte, both in the front seat of the car. At the time of the accident they were less than half a mile from Meaderville on the road to Butte, following a long curve. There is no showing that anyone else was traveling upon the portion of the road when the accident occurred; there were no witnesses to the accident. According to Thompson's testimony he was driving on the right side of the road at about forty miles an hour, which was the speed he drove usually upon a good road. About 200 feet from the point of impact he felt a severe pain in his head and became unconscious; he regained consciousness either very close to the guard-rail on the left side of the road or after the car hit it; he did not remember which. It is apparent that the car did not hit the guard-rail squarely, for from the force of the impact the top rail came through the radiator and into and through the body of the car, injuring Miss Reed so severely that she died about eight hours thereafter. Thompson's leg was broken; he lost the leg.

George McKenzie, a deputy sheriff, testified that on the early morning of September 2 he was informed of an automobile wreck on the Butte-Meaderville highway. He arrived at the scene of the accident some time after it occurred. Miss Reed had been taken away in an ambulance. Thompson was sitting behind the wheel with his foot hanging over the rail that had penetrated the car; "his leg was broken off and his foot was hanging down by a little thread, and the bone was sticking out or protruding past the end of the flesh." Thompson, said McKenzie, was not in very good condition to tell what really happened, but being asked by Mr. Bertoglio, who was with McKenzie, whether someone had run him off the road, Thompson said he did not know what happened. "Mr. Thompson's condition was not very good, that is the reason I did not ask him much in the way of questions," said McKenzie.

On cross-examination Thompson was asked if he did not have a conversation with Mr. Emigh, one of the attorneys for the plaintiff, on the 12th of December, 1932, in the presence of James and Thomas Reed, to which he replied that he did.

Then asked if he did not recall stating on that occasion that at the time of the accident he saw the guard-rail and thought he could miss it or hit it with one wheel, to which he answered that he did not clearly recall it. In answer to the question, "Do you recall vaguely of saying something to that effect?" he said, "There might have been something said of that sort." On the trial he said he had never lost consciousness in that manner before nor since. He testified that he did not go to Meaderville "for the purpose of any business at all." It is clear that his purpose was for the pleasure of his fiancée and himself. There is not the slightest evidence to the contrary. It is clear that when he left the café his immediate purpose was to return Miss Reed to her home.

Admitting that Thompson was the company's agent, the company cannot be held responsible for the accident. Sections 7965 and 7966, Revised Codes 1921, read as follows:

"7965. Unless required by or under the authority of law to employ that particular agent, a principal is responsible to third persons for the negligence of his agent in the transaction of the business of the agency, including wrongful acts committed by such agent in and as a part of the transaction of such business, and for his wilful omission to fulfill the obligations of the principal.

"7966. A principal is responsible for no other wrongs committed by his agent than those mentioned in the last section, unless he has authorized or ratified them, even though they are committed while the agent is engaged in his service."

These sections are but declaratory of the common law. When the application of *respondeat superior* is presented, "the decisive question in every instance is whether the agent or employee was, at the time of negligent injury, acting within the scope of his employment. If he acted independently of his employer, or was upon missions or purposes of his own, then the employer is not to be held accountable in damages." (*Hoffman* v. *Roehl*, 61 Mont. 290, 203 Pac. 349, 350, 20 A. L. R. 189; and see *Susser* v. *Delovage*, 73 Mont. 354, 236 Pac. 1082; *Clawson* v. *Schroeder*, 63 Mont. 488, 208 Pac. 924;

*Ellinghouse* v. *Ajax Livestock Co.*, 51 Mont. 275, 152 Pac. 481, L. R. A. 1916D, 836; 2 C. J. 852.) So much for the general rule.

Thompson in inviting Miss Reed to accompany him upon the pleasure trip was not acting within the scope of his employment, nor in the furtherance of his principal's business. On the contrary, he was upon an independent mission of his own, using his personal car, over which his principal had no control.

Again, it is the rule, applicable here, that a principal is not liable for physical harm caused by the negligent physical conduct of an agent, who is not a servant, during the performance of the principal's business, unless the act was done in the manner directed or authorized by the principal, or the result was one intended or authorized by the principal. (Restatement of the Law of Agency, sec. 250.) Clearly, the relation of master and servant did not exist between the company and Thompson. Those rendering service but retaining control over the manner of doing it are not servants. An agent who is not subject to control as to the manner in which he performs the acts which constitute the execution of his agency is in effect an independent contractor. (Id., sec. 220.)

"A principal employing another to achieve a result but not controlling nor having the right to control the details of his physical movements is not responsible for incidental negligence while such person is conducting the authorized transaction. In their movements and their control of physical forces they are in the relation of independent contractors to the principal. It is only when to the relation of principal and agent there is added that right to control physical details as to matter of performance which is characteristic of the relation of master and servant that the person in whose service the act is done becomes subject to liability for the physical conduct of the actor." (Id., sec. 250.)

We recognized the foregoing principles in *Shope* v. *City of Billings*, 85 Mont. 302, 278 Pac. 826, in which we cited with approval the following definition from the note in the case of

*Westover* v. *Hoover,* 19 A. L. R. 215, at page 235: "An independent contractor is a person employed to perform work on the terms that he is to be free from the control of the employer as respects the manner in which the details of the work are to be executed."

Beyond question, the company was not liable for the acts of Thompson, who, free from the control of his employer, was on a pleasure trip with his sweetheart when disaster overtook them. The company's motion for a directed verdict should have been sustained.

From the multitude of authorities which might be cited sustaining this conclusion, we cite only *Monaghan* v. *Standard Motor Co.,* 96 Mont. 165, 29 Pac. (2d) 378, *Pyyny* v. *Loose-Wiles Biscuit Co.,* 253 Mass. 574, 149 N. E. 541, and *Stockwell* v. *Morris,* (Wyo.) 22 Pac. (2d) 189.

When defendants did not stand upon their motions but proceeded with their defense, they took the risk of supplying the defects in plaintiff's testimony. The company did not supply any defect; on the contrary, the evidence fortified its claim of nonliability. As to the defendant Thompson:

Section 1742, Revised Codes 1921, provides: "Every person operating or driving a vehicle of any character on a public highway of this state shall drive the same in a careful and prudent manner, and at a rate of speed no greater than is reasonable and proper under the conditions existing at the point of operation, taking into account amount and character of traffic, condition of brakes, weight of vehicle, grade." "Traffic must everywhere and at all times keep to the right. Vehicles moving in opposite directions must pass each other by turning to the right." (Sec. 1743, Id., as amended by Laws 1927, Chap. 80, sec. 1.)

Thompson was not necessarily negligent by driving on the left side of the road. If the road was open and free from traffic, the entire road was free for his use. (*Pratt* v. *Kistler,* 72 Mont. 356, 233 Pac. 600.) Thompson could see 200 feet ahead. But this is beside the question, which is: What caused Thompson's car to run into the fence? There was not any

witness to the accident, but the facts constituting negligence may be established by circumstantial evidence, if such evidence tends more strongly to establish the theory of the plaintiff than an inconsistent one. (*Fusselman* v. *Yellowstone Valley L. & I. Co.*, 53 Mont. 254, 163 Pac. 473, Ann. Cas. 1918B, 420; *Childers* v. *Deschamps*, 87 Mont. 505, 290 Pac. 261.)

Thompson was in control of the automobile and presumably in the possession of his faculties. In the absence of any showing that the automobile, without his knowledge, was defective, and the defect caused the accident, the fact that he drove into the fence or guard-rail, on the left side of the road, justified the jury, in the absence of an explanation on his part, in drawing an inference that he was not exercising ordinary care, but on the contrary was negligent.

"Negligence is the failure to do what a reasonable and prudent person would ordinarily have done under the circumstances of the situation, or doing what such a person under the existing circumstances would not have done." (*Kakos* v. *Byram*, 88 Mont. 309, 292 Pac. 909, 912; *Birsch* v. *Citizens' Elec. Co.*, 36 Mont. 574, 93 Pac. 940, 942; *Zanos* v. *Great Northern Ry. Co.*, 60 Mont. 17, 198 Pac. 138.)

An inference is a deduction which the reason of the jury makes from the facts without an express direction of the law to that effect. (Sec. 10601, Rev. Codes 1921.) It "must be founded:

"1. On a fact legally proved; and,

"2. On such a deduction from that fact as is warranted by a consideration of the usual propensities * * * of men." (Sec. 10603, Id.; *Jenkins* v. *Northern Pacific Ry. Co.*, 44 Mont. 295, 119 Pac. 794.)

The usual propensities of men in the possession of their mental and physical faculties would be to avoid running into the fence in the circumstances shown here. (See *County of Alameda* v. *Tieslau*, 44 Cal. App. 332, 186 Pac. 398.) In the absence of obstructions, a defect in the road or car, or other intervening cause, the wreck of a car in the circumstances

disclosed warrants the inference of negligence in operation. (*Baker* v. *Baker,* 220 Ala. 201, 124 So. 740.)

The court, therefore, was correct in overruling Thompson's motion for a nonsuit. "A case should never be withdrawn from the jury unless it follows as a matter of law that recovery cannot be had upon any view of the evidence, including the legitimate inferences to be drawn from it." (*Morelli* v. *Twohy Bros. Co.,* 54 Mont. 366, 170 Pac. 757; *Autio* v. *Miller,* 92 Mont. 150, 11 Pac. (2d) 1039.)

Thompson sought to explain the cause of the accident, as we have shown. If the accident occurred by reason of Thompson's unconsciousness, as he testified, he had a perfect defense. (Huddy's Automobile Law, vols. 3, 4, 75; *Cohen* v. *Petty,* 62 App. D. C. 187, 65 Fed. (2d) 820; *Bushnell* v. *Bushnell,* 103 Conn. 583, 131 Atl. 432, 44 A. L. R. 785; *Armstrong* v. *Cook,* 250 Mich. 180, 229 N. W. 433; 42 C. J. 890.) Counsel for plaintiff argue that there were contradictions in Thompson's testimony, but we are unable to agree with the statement upon the record. However, he was an interested witness and his testimony on this vital issue, while appearing straightforward upon the printed page, may have seemed halting and evasive to the jury who are the sole judges of the credibility of witnesses. The demeanor of the defendant, his manner of testifying, the tone of his voice, the working of his face, the expression of his eyes, may have caused the jury to discredit his explanation. (*State* v. *Sawyer,* 71 Mont. 269, 229 Pac. 734; *Labbitt* v. *Bunston,* 84 Mont. 597, 277 Pac. 620.) The case is close, but we cannot say as a matter of law that his testimony overcame the prima facie case made by the plaintiff.

Upon the theory that the situation presented by the evidence was sufficient to take the case to the jury, we cannot see our way clear to affirm the judgment against him, in view of the fact that the verdict against the company cannot stand. Thompson has not had the privilege of submitting his case to the jury alone. To say the most, the case against him hangs by a thread. To say the least, it is uncertain

whether the jury would have returned so large a verdict against him if he had not been yoked with the company. (*Courtney* v. *American Express Co.*, 120 S. C. 511, 113 S. E. 332, 24 A. L. R. 128.) It was shown by plaintiff that the company was a corporation with offices, or factories, in a number of large cities—its offices ranged from Waterbury, Connecticut, to San Francisco.

The unfortunate young woman left no dependents, so far as the record discloses. She was affianced to the defendant Thompson. Can it be doubted reasonably that the presence of the company, apparently a large corporation, as a co-defendant influenced the jury in returning a verdict of $18,000 against the defendants jointly?

The United States Supreme Court, in *Washington Gaslight Co.* v. *Lansden*, 172 U. S. 534, 19 Sup. Ct. 296, 304, 43 L. Ed. 543, said: "At any rate, the jury has never been called upon to render a verdict against a sole defendant; and while it may be said that, whether against one or against all the defendants, the plaintiff suffers the same damage, and should be entitled to a verdict for the same sum, still the question arises whether a jury, in passing upon the several liability of the individual defendant, would give a verdict of the same amount as it would if both the other defendants remained. We cannot say it would, and as the jury has never rendered a verdict against Mr. Leetch individually and solely, and as the case is one where damages are so largely in the sole discretion of the jury, we think it unjust and improper to permit this verdict to stand against Leetch alone while we set it aside as against the other defendants." (See *Albright* v. *McTighe*, (C. C.) 49 Fed. 817; *Webber* v. *Jonesville*, 94 S. C. 189, 77 S. E. 857; *Capital Lumber Co.* v. *Barth*, supra.)

Manifestly it makes no difference whether the damages are punitive or compensatory if the damages are largely in the sole discretion of the jury. (See *Courtney* v. *American Express Co.*, supra; *Bradley* v. *Blandin*, 94 Vt. 243, 110 Atl. 309; *Whitcomb* v. *Dickinson*, 169 Mass. 16, 47 N. E. 426.)

The assignment of error that the damages awarded are excessive, appearing to have been given under the influence of passion and prejudice, must be sustained. As has been noted, Miss Reed, so far as the record shows, did not have any dependents; there is no evidence that she contributed to the support of any of her relatives or that there was any necessity for her doing so. She survived eight or nine hours after the accident, either in an unconscious or semi-conscious state. Toward the end she was conscious of great pain, but that alone does not warrant a verdict of such size. It is not the policy of the law that the tragedy resulting in her death should endow her heirs. (*Cornell* v. *Great Northern Ry. Co.*, 57 Mont. 177, 187 Pac. 902.)

The case against the company should not have been submitted to the jury; that it was, prejudiced the rights of Thompson. It is reasonable to suppose, and unreasonable to suppose the contrary, that the procedure followed by the court contributed to the excessiveness of the verdict against Thompson. He has not had a fair trial, the circumstances considered. It would be a travesty upon justice and common fair dealing, upon the state of this record, to affirm the judgment against him. Technical objections shall not prevent him an opportunity to have a trial upon the merits.

The judgment is reversed and the cause is remanded to the district court of Silver Bow county, with directions to dismiss the action as to the defendant H. D. Lee Mercantile Company, and to grant the defendant Thompson a new trial.

ASSOCIATE JUSTICES MATTHEWS, STEWART and ANDERSON concur.

MR. JUSTICE ANGSTMAN concurring in part and dissenting in part:

I agree with what is said in the majority opinion with respect to the subject of the liability of defendant company. I also agree with what is said therein to the effect that whether defendant Thompson is liable is a question for the jury. I

do not agree with the conclusion that the case should be remanded for a new trial as to defendant Thompson. As to him I think the judgment should be affirmed.

I concede that at common law the rule was that where a verdict had been rendered against two joint tort-feasors it would not be set aside as against one and permitted to stand as to the other. (20 R. C. L. 224.) The rule is condemned in Ruling Case Law in the following language: "This objection is highly technical and artificial, and the prevailing rule at present is that, inasmuch as tort feasors are jointly and severally liable and an action may be maintained against one or all at the option of the injured party, a verdict may be set aside as to one and allowed to stand as to another." (20 R. C. L. 224, and cases there cited. See, also, *Bailey* v. *C. Lewis Lavine, Inc.*, 203 Pa. 273, 153 Atl. 422, *J. J. Newberry Co.* v. *Faulconer*, 248 Ky. 59, 57 S. W. (2d) 217, *Stamos* v. *Portland Elec. Power Co.*, 128 Or. 310, 274 Pac. 915, *Young* v. *Woodward Iron Co.*, 216 Ala. 330, 113 So. 223, *Weyer* v. *Vollbrecht*, 208 Iowa, 914, 224 N. W. 568, and *Nichols* v. *Dunphy*, 58 Cal. 605.) This is especially true where the instructions as to the measure of damages were proper, as here. (*Broudy-Kantor Co.* v. *Levin*, 135 Va. 283, 116 S. E. 677, 32 A. L. R. 249.) It should be noted, too, that punitive damages are not involved here, as in the cases of *Webber* v. *Jonesville*, 94 S. C. 189, 77 S. E. 857, *Washington Gaslight Co.* v. *Lansden*, 172 U. S. 523, 19 Sup. Ct. 296, 43 L. Ed. 543, and *Albright* v. *McTighe*, (C. C.) 49 Fed. 817, cited and relied upon in the majority opinion.

The case of *Bradley* v. *Blandin*, 92 Vt. 313, 104 Atl. 11, Id., 94 Vt. 243, 110 Atl. 309, cited in the majority opinion, does not touch upon the point here involved. The case of *Whitcomb* v. *Dickinson*, 169 Mass. 16, 47 N. E. 426, was one on an alleged joint contract and is thus clearly distinguishable. The case of *Courtney* v. *American Railway Express Co.*, 120 S. C. 511, 113 S. E. 332, 24 A. L. R. 128, was one in slander, and while it does not appear in the opinion, it is reasonable to suppose that punitive damages were awarded. Where puni-

tive damages are awarded and based upon the wealth of defendants (*Johnson* v. *Horn*, 86 Mont. 314, 283 Pac. 427), unless separate awards are made against each defendant, as should be done in such a case (*Edquest* v. *Tripp & Dragstedt Co.*, 93 Mont. 446, 19 Pac. (2d) 637), there may be reason for granting a new trial to one defendant against whom a joint judgment has been entered, when a dismissal is ordered as to the other. But no such reason exists when the damages are compensatory only, as here.

My associates, evidently realizing this, hold that the award is excessive and appears to have been given under the influence of passion and prejudice. If that be so, then there is justification for the granting of a new trial, and what is said in the majority opinion about the prejudice to Thompson because of submitting the case to the jury as to the company is *obiter dictum*. At most it is but the speculation on the part of the court as to the cause of the prejudice and passion, a matter which does not concern us. If the award is so excessive as to warrant us in saying that it resulted from passion and prejudice, a new trial is proper and it becomes wholly immaterial as to what served as the motivating circumstances in producing the passion and prejudice.

Is the verdict excessive and was it rendered under passion and prejudice? The action was brought by the administratrix on the cause of action that Miss Reed had, and which upon her death survived to this plaintiff. (*Melzner* v. *Northern Pacific Ry. Co.*, 46 Mont. 162, 127 Pac. 146.) It is immaterial that Miss Reed had no dependents or that she did not contribute to the support of relatives. The action is for her own pain and suffering and for the destruction of her earning capacity. That she suffered excruciating pain between the time of her injury and death, a period of about nine hours, is clear. Doctor E. C. Person partially described her injuries and death, as follows: "Her left leg was badly broken through the middle of the left femur; there was a large deep laceration extending from the inner aspect of the left thigh about eight inches above the knee, extending from there up on the back

of the leg, and up on the back of the thigh to about the level of the top of the hip bone. The laceration was approximately two feet in length. It was deep enough so that all the muscles of her thigh were exposed in that region; both ends of the fractured femur were exposed and sticking out of the wound; the femur was a comminuted fracture and also compound. While we were manipulating this leg in an endeavor to put it in good position the patient suddenly died, which was apparently from an embolism from the fractured femur. She died on the operating table." It is true that Dr. Person said that she was "in a rather semi-conscious state," but he also said she would reply to some questions.

Mrs. Walter Edstrom, a sister of Miss Reed, was in the room at the hospital before her sister died, and testified: "While I was in there she was in great pain, and the nurse informed me not to talk to her, it was against the hospital rules, and all she seemed to do was to complain of the pain in her leg."

Miss Reed was earning $175 per month, was 25 years of age, and in good health. She had a life expectancy of 38.81 years. The record shows that an annuity returning to her the sum of $175 per month would cost $42,924. In the complaint plaintiff asked for $40,000. The jury found for less than one-half the sum demanded, and in my opinion the award is amply sustained by the evidence.

We have heretofore sustained a verdict in the sum of $15,000, and I think properly, for the death of an 8 year old boy with no earning capacity. (*Autio* v. *Miller*, 92 Mont. 150, 11 Pac. (2d) 1039, 1045.) In the case of *Staff* v. *Montana Petroleum Co.*, 88 Mont. 145, 291 Pac. 1042, we sustained a verdict for $15,700 for injuries to a woman engaged as a housewife. We have sustained a verdict for $30,000 for injuries to a young man 25 years of age whose earning capacity was reduced by $210 per month and who had expended $3,570 for medical and hospital expenses, and who suffered pain. (*McNair* v. *Berger*, 92 Mont. 441, 15 Pac. (2d) 834.)

"In the very nature of things there can be no fixed measure of compensation; nor may the award in any given case be accepted as a conclusive standard in any other case, because, it being the province of the jury to determine what the amount shall be, the sums awarded in different cases vary as widely as do the individual views, capacities, and dispositions of the men who constitute juries, chosen, as they are, by lot from the body at large of the citizens of the community. So long as we have a system which confides to juries the duty to determine the issues involved in this character of cases and to fix the amount of compensation to be paid, unless the result of their deliberation is such as to shock the conscience and understanding, it must be accepted as conclusive." (*Autio* v. *Miller*, supra.)

I think it cannot be said the verdict of $18,000, under the circumstances here, shocks the conscience. I think, also, that if it be held to be so excessive as to necessitate a new trial rather than a reduction of the verdict, the court should indicate by dollars and cents the amount by which it is excessive, so that plaintiff may amend the complaint accordingly and thus insure avoidance of repetition of the error on another trial. In my opinion, however, the verdict is not excessive, and I think the judgment should be affirmed as against defendant Thompson.

Rehearing denied June 20, 1934.